HICKORY SPRINGS MANUFACTURING COMPANY OF ARKANSAS, INC., AND BILLY SMITH JR. *v.* LINDA KAYE EMERSON AND CARL W. EMERSON

5-5117                                    448 S. W. 2d 955

Opinion delivered January 19, 1970

*Shaw, Jones & Shaw,* for appellants.

*N. D. Edwards* and *Ronnie Batchelor,* for appellees.

CARLETON HARRIS, Chief Justice. Linda Kaye Emerson and her father, Carl W. Emerson, appellees herein, instituted suit against Hickory Springs Manufacturing Company of Arkansas, Inc., and Billy Smith, Jr., for damages allegedly sustained in a collision between a Volkswagen automobile driven by Linda, and owned by her father, and a 1967 International truck and trailer, which was being leased by Hickory Springs Manufacturing Company, and driven by Smith. The accident occurred about 10:00 P.M. on the night of June 20, 1968. Negligence was asserted against Hickory Springs and Smith, such negligence being the proximate cause of the damages sustained. Appellants denied negligence, and asserted that Linda's own negligence was the proximate cause of the collision and resulting damages. On trial, the jury returned a verdict for Miss Emerson in the amount of $50,000.00, and for her father in the sum of $600.00. From the judgment so entered, appellants bring this appeal. Appellants list three points for reversal, which we proceed to discuss, though not in the order set out by appellants.[1]

It is asserted that appellants' motion for a directed verdict should have been granted, the contention being that there is no evidence of negligence by the truck driver. It is contended that the collision was caused by Miss Emerson's negligence, principally because she (it

---

[1]There was no contention that the verdict is excessive.

is contended) ran a stop sign, but it must be remembered that it is not within the province of this court to determine the degree of negligence on the part of the drivers involved; rather, that is a function of the jury. We are only concerned with whether there was any substantial evidence of negligence on the part of Smith, thus creating an issue for jury determination.

According to the evidence, Smith and Tom McBride were co-drivers of the truck for Hickory Springs Manufacturing Company, and were returning from a trip to Tupelo, Mississippi. Smith commenced driving the truck at Brinkley, and the men were returning to the home terminal at Fort Smith when the collision occurred. The location of the accident was the intersection of Highways 71 and 64, within the city limits of Alma. Miss Emerson was traveling east on Highway 64, and was in the process of making a left turn onto Highway 71 north at the time of the collision. The truck was proceeding west on Highway 64 when it struck the Volkswagen.[2] Appellants contend that Miss Emerson ran the stop sign as she entered Highway 71, but appellee stated that she stopped at the sign, started up again, but her car stalled as she entered the intersection. According to her testimony, she was trying to start it when struck by the truck.

We think the evidence was sufficient to go to the jury on the question of appellant's negligence, particularly as to whether a proper lookout was being maintained; there was also evidence which could indicate to the jury that the truck was traveling too fast at the time of the mishap. Ed Blackard, with the Arkansas State Police for 21 years, testified that he went to the scene of the accident after receiving a call, and arrived there some seven or eight minutes after it occurred. He said that there were 144 feet of solid skid marks extending back east from the debris, left by the truck brakes' being applied on asphalt, and 50 or 55 feet more on the other

---

[2]Smith and McBride testified that the Volkswagen struck the truck.

side of the debris. He also testified that there were some skip marks (not solid skid marks) before the solid marks commenced, and counting these, he observed total skid marks of approximately 240 or 245 feet. The officer was not positive of the speed limit at the point involved. The City Marshal of Alma stated that the speed limit at the intersection was 35 miles per hour, though the sign had been torn down, but at another point (evidently meaning the approach), was 40 miles per hour.

The testimony of Smith and the co-driver, McBride, was somewhat confusing, and at times, conflicted not only with the testimony of the fellow driver, but even with prior statements of the witness himself. McBride testified that the truck was traveling at 40 to 45 miles per hour as they approached the intersection (according to this witness, the speed limit was 50 miles per hour). He said that when he first saw the Emerson Volkswagen approaching the stop sign, the truck was 150 to 200 feet from the intersection, and traveling about 35 miles per hour. Smith applied the brakes immediately; the truck was empty.[3] When asked for how long a distance it would take to stop the truck when empty at a speed of 35 miles per hour, the witness replied that it would probably take 100 feet. He thereafter stated that the truck traveled about 50 feet after he applied the brakes, and before the collision occurred;[4] that it traveled between 10 and 20 feet after the collision. It will be observed that McBride testified that the brakes were first applied when the truck was from 150 to 200 feet from the intersection, and then stated that it would take about 100 feet for it to stop traveling at the speed he testified to (35 miles per hour). This being true, it would appear that the truck would have stopped 50 feet before it struck the automobile. Of course, this testimony is very much in conflict with that of Blackard, who testified to approxi-

---

[3] McBride said that a loaded truck could be stopped more easily than an empty one; Smith said that an empty truck could be stopped more quickly.

[4] After making this statement, McBride said that the truck only traveled 20 or 25 feet after the brakes were applied.

mately 200 feet of skid marks before the point was reached where the collision took place.

Smith stated that he first put on his brakes "possibly 200 feet up there," when he saw that the Emerson car "was not going to stop," but he subsequently stated that he first saw the Volkswagen about 100 feet from the intersection. The witness said that, at 35 miles per hour, it took about 100 or 150 feet to stop the truck. According to Smith, the Volkswagen was knocked for about 50 feet, and his truck traveled for about 50 feet after the collision. Certainly, under the testimony of the State Policeman, and these two witnesses (even ignoring other testimony on behalf of appellees which is discussed under the next point), the jury would have been justified in finding either that the brakes were not applied as soon as the peril was discovered (from which it could well appear that a proper lookout was not being maintained) or that the truck was traveling at a much greater speed than that given by appellant's witnesses, and thus could not be stopped within the distance mentioned by the witnesses.

It is asserted that the court erred in permitting Carl Emerson to testify as to alleged skid marks, and to give his opinion as to other facts. We do not find any "opinion" evidence in the testimony of this witness; Emerson simply testified relative to the length of skid marks which appellees contended were made by the truck after it applied its brakes. The cases cited by appellant are not in point, since they deal with opinions given by experts (State Police) concerning the speed of automobiles at the time of a collision, these opinions being based upon findings at the scene (debris, skid marks, damage to and location of vehicles, etc.) rather than actual observance of the speed of the cars when the accidents occurred. Here, only physical facts were testified to, and there was no attempt to reconstruct the accident. Emerson, assisted by friends, measured the skid marks purportedly made by the truck when it first

applied its brakes, and he testified that, counting "solid" skid marks, and "bouncing" skid marks, the total was 419 feet. This testimony was verified by Eddie Bellis, who assisted in making the measurements. The collision occurred on a Thursday night, and these measurements were not made until the following Sunday morning. The testimony was objected to, but the court overruled the objection, telling the jury, however:

"Ladies and Gentlemen of the Jury, you will not give any consideration to the testimony of Mr. Emerson with reference to the skid marks unless there is other evidence indicating to your satisfaction that the skid marks were in fact made by the truck and trailer driven by the defendant at the time of the collision."

There was other evidence relative to this 400 feet of skid marks. Wayne Broyles, a wrecker operator, who removed the Emerson vehicle from the scene, testified that he observed skid marks. He described some of them as "solid," and some as "bouncing." While he took no measurements and did not know the exact distance, he said that they started at the break of the highway where the right lane turned north. Billy Ray Smith, Jr., testified that this "turn-off" was about 400 feet east of the intersection. We think this evidence was sufficient to make the question as to the identity of the skid marks one for jury determination under the court's instruction.

It is contended that the court erred in instructing the jury, as follows:

"If you find that Linda is entitled to recover in this case then you may take into consideration the following elements of damage; any pain and suffering and mental anguish experienced in the past and reasonably certain to be experienced in the future, any loss of earnings, the nature, extent, duration of any injuries and whether it is temporary or permanent, and any scars or disfigurements and visible results of her injuries, the

reasonable expense of any medical care and treatment reasonably certain to be incurred in the future.''

An objection was made, based upon the fact that there was no evidence concerning the loss of future earnings, and appellants are of the opinion that the questioned instruction permits the jury to make such an award, or the instruction is, at the least, ambiguous. We agree that the phraseology used could be improved upon, but we do not agree that error was committed. A careful reading of this instruction makes clear that the jury is not told that Miss Emerson is entitled to recover for loss of future earnings, the language simply stating, ''any loss of earnings.'' It is true that prior to this language, and subsequent to it, the jury is told that the plaintiff can recover for various elements of damage which are reasonably certain to be incurred in the future, but this is not true with regard to the loss of earnings.

Though not entirely clear, it also appears that the objection to the instruction was not made until after it had been given, and the jury had retired. When this objection was made, the court said:

''Let the record show that the instruction complained of instructed the jury that they may consider any loss of earnings, and there was no testimony to any loss of earnings except during the summer immediately after the injury; and that this instruction was made known to the defendants prior to the giving of it to the jury; that there was no pointing out that the defendant had any objection to it as possibly permitting the jury to allow for loss of earnings in the future, and the Court does not so construe this instruction.''

The proper time to take exceptions to instructions is before the jury retires. *Hall* v. *Aetna Life Insurance Company*, 85 F. 2d 447.

On the whole case, we find no error.

Affirmed.